OPINION *Page 2 
{¶ 1} Defendant-appellant Tara Cruse appeals her conviction from the Fairfield County Court of Common Pleas on two counts of murder and one count of aggravated murder. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On June 30, 2006, the Fairfield County Grand Jury indicted appellant on one count of aggravated murder in violation of R.C. 2903.01(A), one count of murder in violation of R.C. 2903.02(B) and one count of murder in violation of R.C. 2903.02(A). The victim was Brian Cruse, appellant's husband. At her arraignment on July 5, 2006, appellant pleaded not guilty to the charges.
 {¶ 3} Thereafter, a jury trial commenced on January 23, 2007. The following evidence was adduced at trial.
 {¶ 4} On June 23, 2006, officers from the Lancaster Police Department were dispatched to the home of appellant and Brian Cruse in response to a call that a woman had stabbed a man. When Officer Nicholas Snyder arrived on the scene, he saw appellant exit the house with a cordless phone in her hand. According to the officer, appellant, who appeared to be intoxicated, said that she had stabbed her husband after he hit her in the ear. When Officer Snyder entered the house, he found the victim on a couch with a large amount of blood on his chest. The victim died from his injuries as a result of the stabbing. When the officer asked Peyton Cruse, appellant's nine year old son, what had happened, he told the officer that "Mommy came home drunk. Her and daddy got in a fight and mommy hurt daddy." Transcript at 78. *Page 3 
 {¶ 5} Appellant was placed into a police cruiser while she was detained for investigative purposes. Officer Snyder testified that he heard a disturbance coming from the back of his cruiser and that his cruiser was shaking and appellant was screaming inside. When he asked appellant what he could do for her, appellant responded "I know what I did was wrong. I stabbed him. Just take me to jail." Transcript at 86. While in the cruiser, appellant also said "Why do they got to clear up the street blocked off here? God, you guys act like it's a major fuck'n scene or something." Transcript at 92.[1] She further stated that she was not a violent person by nature, but that the victim "frick'n pissed me off." Transcript at 95.
 {¶ 6} Testimony was adduced that, while at the police station, appellant told Detective Mike Peters that she had three vodka and orange juices while at work. She also complained that her ear hurt and that her ear was "echoing." Transcript at 104. Appellant also complained of bruises to her stomach and head. Appellant was then taken to the hospital for examination. The following testimony was adduced when Officer Snyder was asked what happened when he was alone with appellant in the hospital:
 {¶ 7} "A. We — it was just in between the injury documentation and my preparation for collecting blood/fluid sites — I'm sorry — fluid sites. I wasn't positive that they were blood. And we were just engaged in small talk. I can't recall exactly what small talk we were engaged in. However, I recall a specific statement by Mrs. Cruse. She just chimed into our conversation and said, I'm sorry. I've got a morbid sense of *Page 4 
humor. I just want to know what happened to my husband, `cause (sic) I got him in the heart.'
 {¶ 8} "Q. And approximately what time was that?
 {¶ 9} "A. 1:53 a.m.
 {¶ 10} "Q. And what was her demeanor when she said that?
 {¶ 11} "A. For me, it was odd behavior, because she had giggled prior to that statement and — sorry. If you don't understand, she kind of had a smirky presence after that, if you understand what that means, kind of nonchalant way of saying it, something that you wouldn't expect somebody making that statement to act like.
 {¶ 12} "Q. And then what time did you leave the hospital that morning?
 {¶ 13} "A. I can't recall that specific time." Transcript at 140-141.
 {¶ 14} At appellant's trial, a CD of the 911 call that she made to the police was played for the jury. During the telephone call, appellant indicated that she had stabbed her husband in the heart after he hit her in the ear while the two were fighting. Appellant asked the dispatcher to send someone before the victim died and later stated that she did not mean to stab him. Appellant further stated as follows:
 {¶ 15} "TARA CRUSE: yes. I fuck'n stabbed my husband. Please hurry up.
 {¶ 16} "DISPATCHER: Okay. I've got that. Has anybody been drinking?
 {¶ 17} "TARA CRUSE: I have been drinking and he's been drinking.
 {¶ 18} "DISPATCHER: You both have been drinking?
 {¶ 19} "TARA CRUSE: And he fuck'n hit me and I fuck'n stabbed him, fuck'n just stabbed him.
 {¶ 20} "DISPATCHER: Okay. And he's barely breathing; right? *Page 5 
 {¶ 21} "TARA CRUSE: Yes." Transcript at 555.
 {¶ 22} At the trial, Patrick McCashen testified that he met appellant and Brian Cruse through some neighbors and that he and his wife went swimming, rode motorcycles together and had cook-outs with the Cruses. After Patrick McCashen was questioned about arguments between appellant and the victim, defense counsel objected arguing that "[i]t's a prior bad act. It's not admissible." Transcript at 480. After the trial court ruled that McCashen could testify as to events that occurred within six to eight months prior to June 22, 2006, Patrick McCashen testified that during one argument between appellant and the victim, appellant threw a beer can at the victim. According to McCashen, during the ensuing altercation, Brian Cruse ended up on the floor on his back with appellant on top of him. He further testified that, during the altercation, appellant grabbed a 20 pound metal vise and "had it over top of her head and she was going to throw it at him." Transcript at 485. McCashen and his wife, Susan, were able to separate the two.
 {¶ 23} Susan McCashen testified that she was good friends with appellant and Brian Cruse and that the two were in her wedding party. Susan McCashen testified that, on June 21, 2006, appellant told her how much she hated the victim and that she wanted to leave him. When asked what happened next, Susan McCashen responded as follows:
 {¶ 24} "A. She proceeded to go on and tell me how much she hated him and she continued — she wanted to leave. And her exact words were: If they ever found him dead, they'd better come looking for her, because she's going to end up — excuse my language — fuck'n stabbing him to death." Transcript at 621. *Page 6 
 {¶ 25} After defense counsel objected to the State questioning Susan McCashen about prior threats that appellant had made, a voir dire was held outside the presence of the jury. During the voir dire, Susan McCashen testified that appellant previously, during an argument with the victim, had stated that she "could just kill him." Transcript at 626. She further testified that on several occasions, such statements were made within the six month period prior to the victim's death. After defense counsel objected, the trial court then ruled that the State could question McCashen as to the six to eight month time period prior to the incident.
 {¶ 26} On direct examination again, Susan McCashen testified that during the six to eight month period prior to the victim's death, appellant had, on several occasions, said that she "could just kill him [the victim]." Transcript at 630. According to Susan McCashen, appellant was always angry when she made such statements. She further testified that, during the previous six months, she had seen one incident involving physical violence between appellant and the victim. The incident was the beer can incident described by her husband.
 {¶ 27} Shelly Workman testified that she knew appellant and the victim for a long time and saw them regularly. She testified that the two were arguing a lot before June 23, 2006 and were having marital problems. Workman testified that she spoke with appellant while appellant was in jail. A CD of the telephone calls between the two was marked as an exhibit and played for the jury. During one of the telephone calls, when Workman asked appellant what she and the victim had been fighting about, appellant stated "`cause I come home drunk." Transcript at 705. During a later call, appellant stated as follows to Workman: *Page 7 
 {¶ 28} "TARA CRUSE: you know what it was? It's because he nags and nags and nag (sic) and nags, and we got into a fight in the garage one time. This is what I told my lawyer. I said, you know — I said, oh, you know, he doesn't realize there's an ax in there. One of these days he's going to piss me off and I'm going to turn around and end up using it on him. I don't think I can reach it off the wall, but —" Transcript at 708.
 {¶ 29} Another witness who testified about the tumultuous relationship between appellant and the victim was Rebecca Bash. Bash, who testified that she had known appellant for ten years, testified that appellant fought a lot with the victim. She further testified that appellant said that she was going to kill him and that appellant talked about leaving the victim. Bash further testified that, during a conversation with appellant on June 23, 2006, appellant indicated that she was having an affair with "Pat" and that the victim had no knowledge of the same.
 {¶ 30} At trial, Angela Kessler testified that, on June 16, 2006, she had a birthday party at her home and that appellant and the victim, whom she had known since 1999, were present. Kessler testified that appellant was drunk that night and that it was not unusual for her to be drunk. Kessler further testified that when she complimented appellant on her relationship with her husband, appellant said "No, you don't understand . . . I can't handle this . . . Something has got to change or I'm going to kill him." Transcript at 724-725. According to Kessler, the two then went back outside. The following testimony was adduced when Kessler was asked what happened when they went outside: *Page 8 
 {¶ 31} "A. We went back outside and everybody was just talking and standing around the fire and laughing. And Brian was sitting in the chair. And we had a machete in the yard where my husband was cutting poison ivy off the trees and he just stuck in the ground. And Tara walked around, backs up, and picks the machete up and starts, you know, swinging it back and forth. And Brian was sitting in the chair in front of her and she just like, `Come on, Brian, give me some shit.' And then she's like, `How easy would that?' And she kind of swung it over the fire. And then Pat grabbed it out of her hand. He said, `Tara ___'
 {¶ 32} "Q. Don't say what Pat said.
 {¶ 33} "A. Oh, okay." Transcript at 727-728.
 {¶ 34} According to Kessler, the victim was sitting in a chair at the time with his eyes shut sleeping. The machete was admitted into evidence as State's Exhibit 70.
 {¶ 35} Testimony was adduced at trial that the victim bled to death as a result of a stab wound and that he was stabbed at least three times with a paring knife.
 {¶ 36} At the conclusion of the evidence and the end of deliberations, the jury, on January 30, 2007, found appellant guilty of one count of aggravated murder and two counts of murder. After the trial court found that all of the counts were allied offenses of similar import and merged the same for the purposes of sentencing, appellant was sentenced to life imprisonment with parole eligibility after twenty (20) years for the offense of aggravated murder. A Judgment Entry of Sentence was filed on February 15, 2007.
 {¶ 37} Appellant now raises the following assignment of error on appeal *Page 9 
 {¶ 38} "THE TRIAL COURT COMMITTED HARMFUL ERROR IN ALLOWING CERTAIN EVIDENCE TO BE ADMITTED OVER THE OBJECTION OF TRIAL COUNSEL."
 I {¶ 39} Appellant, in her sole assignment of error, argues that the trial court erred in allowing evidence of appellant's prior bad acts into evidence over objection. Appellant specifically contends that the trial court erred in allowing in testimony from Susan and Patrick McCashen concerning physical altercations between the parties and threats made by appellant concerning her husband, as well as testimony from Rebecca Bash, Shelly Workman and Angela Kessler concerning similar threats. Appellant further argues that the trial court erred in allowing in Angela Kessler's testimony that appellant had, on June 16, 2006, swung a machete over her husband's sleeping form while stating how easy it would be to kill him.
 {¶ 40} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173, 180, 510 N.E.2d 343. Therefore, we will not disturb a trial court's evidentiary ruling unless we find said ruling to be an abuse of discretion; i.e. unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. State v. Adams (1980),62 Ohio St.2d 151, 157, 404 N.E.2d 144.
 {¶ 41} Evid. R. 404(B) states as follows:
 {¶ 42} "(B) Other crimes, wrongs or acts
 {¶ 43} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, *Page 10 
however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 44} Pursuant to Evid. R. 404(B), prior threats to commit a criminal act are admissible where they are directly related to proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, and are close in time to the criminal act in question.State v. Sargent (1998), 126 Ohio App.3d 557, 568, 710 N.E.2d 1170.
 {¶ 45} In the case sub judice, appellant was charged and convicted of aggravated murder in violation of R.C. 2903.01(A).[2] Such section states as follows: "(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy." We note that appellant's counsel, in opening statements, indicated that "[t]he only element that's at issue in this case is the mens rea . . ." Transcript at 61. Thus, at issue in this matter was whether appellant intended to kill the victim.
 {¶ 46} In State v. Rice, Butler App. No. CA2003-01-015, 2004-Ohio-697, the appellant was charged with and convicted of the murder of Toni Upton. The victim, who died after being stabbed, had lived with the appellant and had dated him. She had told the appellant that she was moving out and that their relationship was over.
 {¶ 47} At trial, a woman named Lisa Hyde testified that approximately three months before the murder, she had a conversation with the appellant at a pub and that, during the conversation, the appellant had pulled out a knife and told her that he would not have a problem with cutting anyone who messed with him. When Hyde asked appellant where Upton was, the appellant stated that he would cut her "fucking head *Page 11 
off." The appellant's counsel objected to such testimony, but the trial court overruled the objection.
 {¶ 48} On appeal, the appellant argued that the trial court erred when it permitted Lisa Hyde to testify, arguing that her testimony was "too remote in time to the events in question." The Court of Appeals, however, disagreed, stating, in relevant part, as follows: "Hyde's testimony indicates that appellant's statements consisting of threats to cut anyone that fucked with him and to cut Upton's head off were specifically directed toward Upton and occurred only a few months prior to Upton being found dead as a result of a stabbing. Appellant's statements were not too distant in time as to have no probative value because the statements reflected the type of conduct with which appellant was charged. Appellant's statements were also probative of whether the stabbing was accidental. Therefore, the trial court could have reasonably concluded that the statements were admissible pursuant to Evid. R. 404(B).
 {¶ 49} "The trial court's decision to admit the evidence was not arbitrary, unreasonable, or unconscionable." Id at paragraphs 20-21.
 {¶ 50} Although not a murder case, we find the case of State v.Sargent (1998), 126 Ohio App.3d 557, 710 N.E.2d 1170 also to be instructive. In Sargent, the appellant was convicted of aggravated arson. At his trial, a woman who lived next door to Helen Tarbox, whose house was burned, testified that she previously had heard the appellant make threats on a few occasions to burn down the Tarbox house. The threats were made a few months before the fire. On appeal, the appellant argued that the trial court erred allowing in such testimony regarding other acts. *Page 12 
 {¶ 51} The Twelfth District Court of Appeals, however, disagreed, stating, in relevant part, as follows: "We find that the trial court properly admitted Boyce's testimony pursuant to Evid. R. 404(B). The testimony as to appellant's prior threats to burn Tarbox's home was directly related to proof of motive, intent, preparation, plan, knowledge, identity, and absence of accident as allowable under Evid. R. 404(B). Boyce's testimony indicates that appellant's statements consisting of threats to burn Tarbox's home were specifically directed toward Tarbox and occurred only a few months prior to the fire at Tarbox's residence. Because appellant's statements were close in time to the fire and reflected the type of knowledgeable conduct with which appellant was charged, the trial court could have reasonably concluded that the statements were admissible pursuant to Evid. R. 404(B). Appellant's statements were also probative of whether the fire was accidental." Id at 568.
 {¶ 52} In the case sub judice, we find that the trial court did not abuse its discretion in allowing in testimony of other bad acts because the trial court's decision was not arbitrary, unconscionable or unreasonable. The testimony as to appellant's prior bad acts was directly related to proof of "motive, intent, preparation, plan, knowledge, identity, and absence of accident" as allowable under Evid. R. 404(B)
 {¶ 53} As is stated above, appellant specifically takes issue with the testimony from Susan McCashen and Patrick McCashen about physical altercations between the parties as well as testimony from the McCashens, Rebecca Bash, Shelly Workman and Angela Kessler as to threats appellant made to kill the victim. Appellant also challenges testimony about an incident during which appellant allegedly swung a machete over the *Page 13 
victim while he was sleeping while stating how easy it would be to kill him, as well as statements attributed to appellant concerning her use of an ax to kill him.
 {¶ 54} However, we note that all of the threats and incidents were directed at the victim in this case and occurred within six to eight months prior to the murder. As is stated above, Susan McCashen testified that appellant threatened to stab the victim within 48 hours of the stabbing, and Shelly Workman testified that appellant threatened to use an ax on the victim. Such statements reflected the type of conduct with which appellant was charged. While appellant contends that the trial court should not have admitted evidence of threats made months before the murder, we find that the threats were sufficiently close in time. See, for example, State v. Morris (1989), Butler App. No. 88-06-081,1989 WL 11510. In Morris, the appellant was convicted of murdering his wife on December 6, 1987. On appeal, he argued that the trial court had erred in allowing the testimony of Kathy Holland concerning a prior threat by appellant towards the victim. The appellant, in August or September of 1987, and October of 1987, had threatened to kill the victim. While the appellant argued, in part, that the statements were too remote in time, the court, in Morris disagreed, noting that "[t]he requirement of a `temporal, modal, and situational relationship' between a prior act of the defendant and the crime charged does not mean that the two must be identical. This requirement merely represents the `common sense conclusion that an act too distant in time or too removed in method or type has no permissible probative value to the charged crime.' State v. Snowden (1976), 49 Ohio App.2d 7, 10." Id at 4.
 {¶ 55} We find that the threats and incidents in this case, which were limited to the six to eight month period prior to the murder, were not so removed in time as to *Page 14 
have no probative value and tended to show appellant acted with purpose to kill her husband.
 {¶ 56} Moreover, while appellant specifically challenges the admission of testimony which indicated that, on June 16, 2006, just a week before the murder, appellant swung a machete over her husband's sleeping form, we note that appellant was convicted of stabbing her husband. Such "prior bad act", which involved a similar weapon (i.e. a stabbing instrument), was, therefore, clearly probative as to appellant's intent and whether she acted with purpose on June 23, 2006.
 {¶ 57} Appellant's sole assignment of error is, therefore, overruled.
 {¶ 58} Accordingly, the judgment of the Fairfield County Court of Common Pleas is affirmed.
Edwards, J. Farmer, P.J. and Wise, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Fairfield County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] Appellant's conversation with Officer Snyder while in the police cruiser was recorded. A CD of the same was played for the jury.
[2] Appellant also was charged with two counts of murder.