[Cite as *State v. Hunter*, 2013-Ohio-1469.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 24844 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 11-CRB-194 |
| v. | : | |
| | : | |
| CYNTHIA D. HUNTER | : | (Criminal Appeal from Montgomery |
| | : | County Municipal Court - Western |
| Defendant-Appellant | : | Division) |
| | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 12th day of April, 2013.

. . . . . . . . . . .

RAYMOND J. DUNDES, Atty. Reg. #0041515, City of Trotwood Prosecutor's Office, 7 South Mechanic Street, Lebanon, Ohio 45036
      Attorney for Plaintiff-Appellee

ANGELA WILSON MILLER, Atty. Reg. #0064902, 322 Leeward Drive, Jupiter, Florida 33477
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FAIN, P.J.

{¶ 1} Defendant-appellant Cynthia Hunter appeals from her conviction for Violating

a Protection Order, for which she was sentenced to one hundred eighty days in jail, all of which was suspended. She was also fined $100 and placed on non-reporting community control for a period of three years. Hunter's initial appellate counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), stating that after reviewing the record and the applicable law, she found no potentially meritorious issues for appeal. Counsel set forth one potential assignment of error, which counsel concluded is frivolous: that the conviction is against the manifest weight of the evidence.

{¶ 2} Upon exercising our duty of independent review, we found a potential assignment of error having arguable merit, based upon a misstatement by the trial court of the applicable burden of proof. The trial court was the finder of fact in Hunter's bench trial. We also noted that the trial court, in its sentencing entry mistakenly recited that Hunter had pled guilty to the offense. Accordingly, we rejected the *Anders* brief, and caused new counsel to be assigned.

{¶ 3} Newly assigned counsel has not set forth an assignment of error based upon the trial court's misstatement of the applicable burden of proof – understandably so, since the trial court has now corrected the record to reflect that it did, in fact, employ the correct burden of proof, and that Hunter did not plead guilty, but was, in fact, convicted after a bench trial. But newly assigned counsel has set forth two assignments of error for our consideration.

## I. The Protection Order and its Alleged Violation

{¶ 4} In February 2011, M.C. was granted an ex parte protection order against Hunter. Of relevance hereto, the protection order states:

RESPONDENT SHALL STAY AWAY FROM protected persons named in this Order, and shall not be present within 500 feet of any protected persons wherever those protected persons may be found, or any place the Respondent knows or should know the protected persons are likely to be, **even with the protected persons' permission**. If Respondent accidentally comes in contact with protected persons in any public or private place, Respondent must depart *immediately*. This Order includes encounters on public and private roads, highways, and thoroughfares. (Emphasis sic.).

{¶ 5} M.C. and her parents, Marquette and Michael Curington, are protected persons under the terms of the Order. Hunter was properly served with notice of the protection order.

{¶ 6} Three days after the issuance of the ex parte protection order, after Hunter had been served with it, Hunter was in her vehicle within 500 feet of the Curington residence. She was arrested and charged with one count of Violating a Protection Order in violation of R.C. 2912.27.

{¶ 7} At trial, the following evidence was presented by the State. Michael Curington was in his garage when he saw a red truck pull into his driveway. He testified that he recognized the car as Hunter's, so he ran into the house and grabbed his camera. He then ran back out and took pictures as Hunter drove away. He testified that he then got in his car to follow her, and that he then caught up with her and took more pictures. The pictures were admitted in evidence.

{¶ 8} Glyndon Wilson also testified for the State. She indicated that she lives next door to the Curingtons, and that she was home on the evening in question. She testified that her granddaughter was home with her. Wilson testified that she "usually" leaves her porch light on,

and that she turns it on "early." She also testified that the porch light was on that evening. Wilson testified that she knows Hunter because Hunter's daughter has spent the night at her house with Wilson's granddaughter. She denied ever babysitting Hunter's children. Wilson testified that she had no knowledge that Hunter intended to come to her house on the evening in question, and had not talked to her about doing so. Wilson also testified that shortly thereafter, Hunter called her and said that she wanted Wilson to sign a note "stating that [Wilson] was her daughter's babysitter." Wilson testified that she declined to do so because she did not babysit the child.

{¶ 9} The State presented the testimony of Trotwood Police Officer Brian Douglas who testified that he was on duty that evening, when he responded to a call from Hunter stating that she was in her vehicle being followed by another vehicle. He testified that Hunter said there was a protection order in place, and that "there was one being ordered on both ends." He testified that Hunter said that she had gone to Wilson's residence, but that she left when she saw no lights on at the home. He testified that Hunter said that a car began following her as she left, and that she saw the person in the car taking photographs of her vehicle. A certified copy of the protection order was admitted into evidence.

{¶ 10} Hunter testified on her own behalf. She testified that there was an ongoing dispute between her daughter and the Curingtons' daughter, M.C. She testified that she was at school when she "received a call from my daughter and Ms. Wilson's granddaughter saying that the Curingtons was [sic] harassing and threatening them." She testified that, because she was crying and afraid, she left school and picked up her sister. She testified that when she arrived at

Wilson's home, Wilson "met [her] at the car and [said that the] kids next door have been harassing and calling these kids all day. And I will not let them go outside because I'm afraid of them." Hunter testified that she then asked Wilson to keep the girls inside next weekend while Hunter was in school. She testified that the next weekend she picked up her daughter, and Wilson told her that she had kept her house alarm on because she was "sick" of the kids next door, who continued to harass Hunter's daughter and Wilson's granddaughter.

{¶ 11} Hunter testified that three days before the protection order was issued, she, her daughter, and another woman were grocery shopping when they were accosted by M.C. and another woman whom she did not know. She testified that the other woman threatened Hunter, and identified M.C. as her "little sister." Hunter testified that M.C. then used her cellular telephone to call her mother. Hunter testified that as she was loading her groceries into her car, "four carloads of people pull up." She testified that the people included the Curingtons, "the grandmamma, an auntie, a cousin, some sisters, some friends. It's just like four cars – a gang load of people." She testified that Mr. Curington got out of the car and began speaking in a threatening tone when the police arrived. She testified that the officers advised her to get a protection order, but she did not.

{¶ 12} Hunter testified that on the day of the alleged violation, her daughter advised her to go talk to Ms. Wilson. Hunter stated that she decided to call Wilson first, but that no one answered the telephone. Hunter testified that "on that night, I – against my – I don't know what I was thinking, just trying to save – or at least get a witness statement or something from – to take to court because I had to go to court [on the protection order hearing] two days from then." She

testified that she took her daughter and a "man" with her to Wilson's home, but that she drove on when she saw that no lights were on. She testified that she had never gone all the way down that street before, so she was unaware that it was a dead end. She testified that she performed a U-turn at the end of the street, and was almost back to Wilson's house, when she saw a man chasing her car on foot and taking pictures. Hunter testified that the man got into his car, followed her, and bumped into her vehicle. She then called the police, and was advised to get to the police station. Hunter denied stopping in the Curington driveway.

{¶ 13} On cross-examination, Hunter testified that she knew where the Curingtons lived, and that she knew there was a protection order prohibiting her from coming within 500 feet of the Curingtons. She testified that she did not go into the Curington driveway, and that she was never within 500 feet of their home. She testified that she had been going over there for "four weeks in a row because Ms. Wilson was babysitting my daughter [who] would spend the night there." Hunter testified that Wilson has "dementia or something," because she did babysit Hunter's child for "three weekends in a row." Then she testified that Wilson was the babysitter, because she was the only adult present in Wilson's home when Hunter's daughter spent the night.

{¶ 14} Hunter's daughter, T.B., testified that she and her mother were going to Wilson's home on the day of the alleged violation in order to get a statement regarding the protection order. She testified that as they drove past Wilson's home they observed no lights on. She testified that they drove past the home, turned around and then Mr. Curington began to chase them. On cross-examination, she testified that it was her idea to get a statement from Wilson,

but that her mother told her that she could not go there, because she could go to jail.  T.B. testified that she had called the Wilsons, and no one answered, but they decided to go anyway.

{¶ 15}    When asked how far their vehicle was from the Curington home, the prosecutor identified the wall behind T.B. as the Curington home.  T.B. then pointed to the fourth row of seats in the courtroom.  When the prosecutor stepped to that spot and stated, "approximately here?  About a hundred feet?" T.B. stated, "no, the fifth row."  The prosecutor then stepped to the fifth row of seats and asked if it was that far to which T.B. stated, "it was farther than that," and indicated that the distance may have been "a lot more" than even the opposite wall of the courtroom.  She then testified that she knew the car was never within 500 feet of the Curington home.

{¶ 16}  On re-direct, the following colloquy took place between T.B. and defense counsel:

> Q: Okay, you've been to football games?
>
> A: Yeah.
>
> Q: You know a football field, how long it is?
>
> A: Uh-huh.
>
> Q: From where the car was and where the house is, it was longer than a football field, wasn't it?   A lot longer?
>
> A: Yeah.
>
> Q: Okay, because you're not real good with distances with this stuff the Prosecutor's trying to say about a wall or something over here where he's

standing. It's hard to tell isn't it?

A: Yes.

Q: But when you were there that evening, it was longer – it was almost two football fields, wasn't it?

A: Yes.

Q: And that's the distance that you're understanding, correct?

A: Yes.

Q: And Ms Wilson you know her, correct?

A: Yes.

Q: She's older?

A: Yes.

Q: Some people would call her senile?

A: Yes.

Q: So she forgets things a lot?

A: Yes.

Q: And you think that's what happened in this case what the prosecutor's trying to point out?

A: Yes.

{¶ 17} The State then presented Wilson and Officer Douglas as rebuttal witnesses. Douglas testified that he is a road officer, and that during his investigation he made some measurements. He testified that the distance from the roadway to the Curington home is

approximately 150 feet.   Wilson testified that she has not been diagnosed with dementia or any related problem.   She testified that she is retired, but is involved with numerous activities.   She testified that she travels extensively.   She testified that she is not afraid of the Curington children.

## II.   The Complaint Was Sufficient to Put Hunter on Notice
## of the Offense with which She Was Charged

**{¶ 18}**   Hunter's First Assignment of Error states:

THE   COMPLAINT   AGAINST   APPELLANT   HUNTER   WAS INSUFFICIENT UNDER OHIO R. CRIM. P. 3

**{¶ 19}**   Hunter contends that the conviction should be reversed because the complaint is deficient as it did not put her on fair notice as to the accusations against her.   Specifically, she argues that a "material element [of the offense] is left to conjecture" because the complaint does not include "facts or subsections on the complaint describing what [she] allegedly did."

**{¶ 20}**   Crim.R. 3 provides that "[t]he complaint is a written statement of the essential facts constituting the offense charged. It shall also state the numerical designation of the applicable statute or ordinance.   It shall be made upon oath before any person authorized by law to administer oaths."

**{¶ 21}**   The purpose of a criminal complaint is "to inform the accused of the identity and essential facts constituting the offense charged."   *State v. Echemendia*, 6th Dist. Ottawa No. OT-95-059, 1996 WL 475994, * 1 (Aug. 23, 1996).   A complaint is deemed sufficient if it

charges an offense in the words of the statute upon which it is based. *State v. Hadley,* 6th Dist. Fulton No. F-09-007, 2009-Ohio-4595, ¶ 11.

**{¶ 22}** Herein, the complaint states that Hunter was charged with "recklessly" violating "a term of a protection order * * * contrary to and in violation of Temporary Protection Order, Section 2919.27 of the Ohio Revised Code, a 1st degree misdemeanor." It sets forth the time of the violation and identifies the place of the violation as the Curington residence. The complaint was also signed by Marquette Curington.

**{¶ 23}** R.C. 2919.27(A) states that no one "shall recklessly violate the terms of a protection order." The statute then has three subsections setting forth the types of protection orders to which it applies. Hunter does not contend that she was subject to any protection order other than the one issued in favor of the Curingtons. Nor does she contend that she was unaware of the issuance of that order. Furthermore, she was aware of the conditions of that order and of the fact that going near their home was a violation of that order.

**{¶ 24}** We find no deficiency in the complaint. Hunter's First Assignment of Error is overruled.

### III.  Hunter's Conviction Is Supported by the Evidence

**{¶ 25}** Hunter asserts the following as her Second Assignment of Error:

THE TRIAL COURT'S FINDING OF GUILT WAS NOT SUPPORTED

BY SUFFICIENT EVIDENCE AND DENIED APPELLANT HUNTER DUE

PROCESS UNDER THE FEDERAL AND STATE CONSTITUTIONS.  U.S.

CONST. AMEND. V, AND XIV, OHIO CONST. ART. I, § 10.

**{¶ 26}** Hunter contends that the State failed to prove that she acted recklessly, the mental culpability state necessary for the offense. She argues that the evidence demonstrates that "she acted in good faith when she went to interview Ms. Wilson in preparation of her court date[,] * * * [and that she] inadvertently drove past the Curington home."

**{¶ 27}** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

**{¶ 28}** Hunter was convicted of Violation of a Protection Order. That offense is codified at R.C. 2919.27(A)(2), which states, in relevant part, that "no person shall recklessly violate the terms of any * * * protection order issued pursuant to section 2151.34, 2903.213, or 2903.214 of the Revised Code."

**{¶ 29}** "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is

likely to be of a certain nature." R.C. 2901.22(C).

{¶ 30} Even if we accept Hunter's version of the events, the evidence establishes that she was aware of the prohibition against coming within 500 feet of the Curington family, and that, despite this knowledge, she chose to drive on the roadway directly in front of the Curington residence. The evidence establishes that the roadway is a distance of about 150 feet from the house. Her testimony establishes that she was aware of the location of the Curington residence, and of the fact that going there would result in a violation of the protection order. Therefore, a reasonable finder of fact could find from this evidence that the essential element of recklessness was proven beyond a reasonable doubt.

{¶ 31} Furthermore, Michael Curington testified that Hunter pulled her vehicle directly into his driveway before driving away. The trial court could have credited Curington's version of the incident over Hunter's version. The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the finder of fact to resolve. *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). Curington's testimony is not inherently incredible, and the trial court could therefore have relied upon it in reaching its verdict.

{¶ 32} The evidence in this record, construed in a light most favorable to the State, is sufficient to support the conviction. Hunter's Second Assignment of Error is overruled.

## IV.  CONCLUSION

{¶ 33} Both of Hunter's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

DONOVAN and WELBAUM, JJ., concur.


Copies mailed to:

Raymond J. Dundes
Angela Wilson Miller
Hon. Adele M. Riley

Submitted:     Thursday, April 4, 2013