[Cite as *State v. White*, 2015-Ohio-3512.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 26093 |
| | : | |
| v. | : | Trial Court Case No. 2012-CR-1322 |
| | : | |
| SAMUEL M. WHITE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 28th day of August, 2015.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by CARLEY J. INGRAM, Atty. Reg. No. 0020084, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45402
  Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, 120 West Second Street, Suite 400, Dayton, Ohio 45402
  Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Samuel White appeals his conviction for felony murder. Finding no error, we

affirm.

## I. Background

{¶ 2} Bryan Coatney was fatally shot around 10:25 p.m. on April 21, 2012, while standing outside the front door of his Dayton home. Six months later, White was arrested in Texas and charged with Coatney's murder.[1] In early 2014, the case was tried to a jury. Numerous witnesses testified at the trial, including Stacy McGee, Coatney's fiancée; FBI Special Agent Kevin Horan; Velvis Priest, a friend of White; Nielah Ivery, White's girlfriend at the time; and Adell Lawrence, Ivery's stepfather. White also took the stand in his own defense. His defense was alibi. He testified that on the night of the murder he and Ivery were at a movie theater in Huber Heights. White said that he did not leave the theater until almost 10:15 p.m., so he could not have been at Coatney's house in Dayton when the shooting occurred. White said that when he got into Dayton, he dropped Ivery off at their home and went to Priest's house. White's, Priest's, and Coatney's houses are within a mile of each other and are all located just west of Riverside Drive, which as the name suggests, runs along a river. White and Ivery lived together at 85 Mary Avenue, and Priest lived at 328 Fernwood Avenue. Coatney and McGee lived together at 231 E. Parkwood Drive.

### A. The prosecution

{¶ 3} The testimony shows that there was bad blood between White and Coatney and had been for a couple of years. Before Coatney met Stacy McGee, he had dated Ivery. After Coatney and Ivery broke up, Ivery met White. In the years after the break up,

---

[1] Specifically, White was indicted on two counts of felony murder in violation of R.C. 2903.02(B), two counts of felonious assault in violation of R.C. 2903.11, and firearm specifications.

there were ongoing problems between Coatney and Ivery and between Coatney and White over Ivery. Ivery continued to call Coatney, and at one point, she obtained a protection order against him. McGee testified that a couple of years before the murder, White called Coatney and threatened to kill him. About six weeks before Coatney was murdered, someone vandalized McGee and Coatney's car while it was parked in their driveway. They believed that White and Ivery had done it, because White and Ivery had recently accused them of vandalizing their blue Tahoe. Also, earlier in the month that Coatney was murdered, White told his supervisor at work that he was having trouble with Coatney and accused Coatney of slashing his tires and keying his Tahoe. A few days after the murder, White told police that he had heard that Coatney had been bragging to Ivery's relatives that he (Coatney) was still sleeping with her.

{¶ 4} Coatney was murdered on a Saturday night. McGee testified that that night, she and Coatney had returned home from the grocery store around 10:15 p.m. After putting the groceries away, she opened the blind on the front window and saw a blue Tahoe parked facing the river along the curb in front of the house. She recognized it as White's. Coatney stepped out the front door onto the porch, while McGee remained inside. She heard a male voice call out from the Tahoe, and she heard Coatney respond. McGee turned and started walking to the kitchen. Suddenly, she heard gunshots ring out. Coatney stumbled inside, bleeding and yelling that he had been shot. He then collapsed on the living room floor.

{¶ 5} Five or six houses down the street, two men were standing outside talking when they heard the shots. One of the men looked in the direction of Coatney's house and saw a dark colored SUV accelerating towards Riverside Drive. He used his cell

phone to call 911. When his call came in, it was 10:25 p.m.

{¶ 6} When police arrived at the scene, McGee told them that White had shot Coatney and told them about the blue Tahoe. Around 11:35 p.m., a police officer stopped the Tahoe near the intersection of Riverside Drive and Ridge Avenue. Tina Jones, the girlfriend of White's friend Priest, was driving. When police later searched the Tahoe, they found two bullet casings on the driver's side floor and a set of earplugs.

{¶ 7} Priest testified that White arrived at his house that night between 10:40 p.m. and 10:45 p.m. White let Jones use the Tahoe to run some errands, while he and Priest finished a game of dominoes that they had started earlier that day. When Jones did not come back, Priest took White home. When White got home, around 12:30 a.m. Sunday morning, Ivery told him that the police were looking for him, so he called them. The police immediately came and arrested him and Ivery and brought them in for questioning. Among other things that White told the detectives, he told them that the gun he had purchased about a week earlier had been stolen from his Tahoe the night before the murder, while it was parked at a United Food store. White said that he thought Coatney might have done it. After several hours of questioning, White and Ivery were released.

{¶ 8} Later that morning, Adell Lawrence, Ivery's stepfather, went to White and Ivery's house. Lawrence testified that he found Ivery sitting on the couch crying. He asked White what had happened, and White told Lawrence that he had killed Coatney:

Mr. Lawrence, I got tired of him effin with me. He thought I was playing. I got tired of him effin with me.

* * * Who?

* * * Bryan [Coatney]. I told you I got tired of him effin with me.

* * * You didn't kill him did you, Sam?

* * * Yes, he thought I was playing. I got tired of him effin with me. I don't know what I'm going to do.

(Tr. 717) (Sept. 25, 2014).[2] Lawrence and White then steped outside onto the porch, where White again said they he killed Coatney:

I'm tired of him effin with me, man. I'm tired of it.

* * * You kill the man? * * * You shot him?

Yes, Mr. Lawrence.

(*Id.* at 719). Lawrence asked White what he did with the gun, and White, pointing toward the river, said, " 'We got rid of it.' " (*Id.*). According to Lawrence, the gun was wiped down, by either White or, so Lawrence said he had heard, Lawrence's brother-in-law Johnny Fisher.

{¶ 9} On Monday, White went to work. His supervisor testified that White had previously told him that a man was at his house and slashed his tires and that he (White) had followed him home. When White came in on Monday, he told the supervisor that "he needed [the supervisor] to collaborate [sic] a story," that his gun was stolen a week ago. (*Id.* 845). White "wanted [the supervisor] to go along with it." (*Id.* at 846). The supervisor asked why, and White told him that "the guy that got killed followed him to his house and did something, so he followed the guy back, shot—said the guy was at his door and he shot him, killed him." (*Id.* at 847).

{¶ 10} A little over a week later, on May 1, police brought White back in for questioning. By then, they had found the two bullet casings on the driver's side floor of

---

[2] Three sets of trial transcripts were filed—on April 25, 2014; September 17, 2014; and September 25, 2014.

White's Tahoe. They had also obtained surveillance video from the United Food store that showed that White's Tahoe was not there on the day that White had said his gun was stolen. White told detectives that it was not possible for bullet casings to be in his truck, because he had never fired a gun in his life. When confronted with the surveillance video, White recalled, to himself, that he had not actually gone to the store that evening and that the gun must have been stolen when the Tahoe was parked in his garage. He did not tell the detectives this, White said, because he believed they were twisting his words. White was again released without being charged.

{¶ 11} Three days later, on May 4, Adell Lawrence called Crime Stoppers and told them where the gun might be. Later that day, police found a semiautomatic pistol on the riverbank across from White's house. The gun had one round in the chamber and the magazine was empty. Using the gun's serial number, police learned that White had purchased it a week before the murder. Police had found five bullet casings on the ground in front of Coatney's house, and they were able to determine that these casings and the two found in the Tahoe were fired from a gun like White's. Police found White's DNA on the earplugs they had found in his Tahoe.

{¶ 12} Later in May, White was fired from his job and took another job working in construction. In late June, he fell from a roof and was hospitalized with serious injuries, including shattered bones in his wrists, broken bones in his face, a collapsed lung, and a pierced lip. After White was released, he and Ivery broke up, and he moved to Texas.

{¶ 13} The state presented expert testimony about White's cell phone use and location on the night of the murder from FBI Special Agent Kevin Horan, a member of the FBI's Cellular Analysis and Survey Team. The trial court held a *Daubert* hearing to

determine whether to admit the testimony. Horan testified that, in a city, a cell tower is usually designed to cover one or two blocks. To get 360 degrees of coverage, a tower typically has three groups of antennas, each providing roughly 120 degrees of coverage. Each group represents one "sector." The geographical area covered by a sector is roughly defined by the direction that the sector's antennas are pointing and the strength of their signal. The coverage area is called the sector's "footprint." To connect with a sector's antennas, a cell phone must be within the sector's footprint. Sector footprints can overlap, and a phone will connect with the strongest, clearest signal it finds. The best signal does not necessarily come from the antennas that are geographically closest to the phone. Factors like weather and presence of tall structures can result in a stronger signal from antennas farther away. Each time a phone connects to a tower, data about the phone, the connection, and the sector is logged. Consequently, a tower's data logs show that a particular phone was within the footprint of one of its sectors at a particular time.

{¶ 14} Horan testified that he used log data for White's, Ivery's, Priest's, and Coatney's cell phones on the night of the murder to determine who called whom, at what time, and how long the calls lasted. Horan said that Priest called White at 10:20 p.m., but White did not answer. Ten minutes later, between 10:30 p.m. and 10:40 p.m., White called Ivery nine times, but Ivery never answered. Around 10:40 p.m., Priest called White twice. The first call lasted about 4 seconds, and the second lasted two-and-a-half minutes. Between 10:46 p.m. and 11:16 p.m., White called Ivery five more times, and each call lasted less than four seconds.

{¶ 15} Horan testified that a sector's estimated or theoretical footprint can be calculated with reasonable accuracy. But in this case, Horan said, he mapped the actual

footprints of the three key sectors. White's house is in sector 106-2; Coatney's house is in sector 106-1; and Priest's house is in sector 89-2. Using the log data, Horan tracked the movement of White's phone and consequently White himself:[3]

- At 10:30 p.m., the phone was in sector 106-2.

- At 10:31 p.m., it dropped slightly south into sector 87-2, where it remained until at least 10:36 p.m.

- At 10:38 p.m., the phone was back in sector 106-2.

- At 10:46 p.m., it was in sector 106-1.

- At 10:48 p.m., the phone was in sector 89-2, where it stayed until at least 11:24 p.m.

- At 12:59 a.m., the phone was back in sector 106-2.

**B. The defense**

{¶ 16} White took the stand and testified that on the night of the murder he and Ivery went to a movie in Huber Heights. He said that the movie did not end until after 10:00 p.m. They stayed for the credits, and he re-filled his drink on the way out. The theater was full, and at 10:12 p.m. he was still trying to get out of the parking lot. White said that he got home around 10:30 p.m. He dropped off Ivery and then went to Priest's house, arriving around 10:45 p.m. White also testified that he had purchased the gun a few weeks before the murder and that on the night before the murder someone had stolen it from his truck. He said that he did not report it stolen that night, because Ivery told him that the Dayton Police Safety Building was probably closed for the weekend. He intended to report the theft on Monday. White denied that Adell Lawrence had come to his house

---

[3] There was no testimony that White did not have his phone with him that night.

the morning after the murder, and White denied telling Lawrence that he had shot Coatney or that he had thrown the gun on the riverbank. White also denied asking his supervisor to lie for him. As to the reason he moved to Texas, White said that his father lived there and that he moved there so his father could help him regain his health.

{¶ 17} Ivery testified that the movie they saw, "Think Like A Man," started 30 or 40 minutes later than the listed time, which she remembered as 7:45 or 8:00 p.m. They sat through the ending credits, then waited five or ten minutes to let the crowd thin before they left. White dropped her off at home and went to Priest's house. Ivery too denied that her stepfather had come to the house after they were released, and she denied that White admitted killing Coatney.

{¶ 18} In rebuttal, the assistant manager of the movie theater testified that the movie "Think Like A Man" started on time that night at 7:40 p.m., and was over, including the credits, at 9:56 p.m. He said that the theater would not run a film after a delay of even 15 or 20 minutes and would instead refund the purchased tickets. The assistant manager also testified that the one operational surveillance camera at the theater was trained on the employees working in the box-office. He said that this camera showed patrons only from the waist down and only as they entered the theater. A detective testified that he watched the video from this camera taken on the night of the murder and saw nothing material. The detective also testified that it took him 15 minutes to drive from the theater to the scene of the shooting, at the posted speed limit, using the route that White said he took.

{¶ 19} Before trial, the state filed a request asking the court to give the jury an instruction on flight as showing consciousness of guilt. The court included a flight

instruction among the instructions it gave the jury.

{¶ 20} The jury returned guilty verdicts on all counts and specifications. After merger and election, White was sentenced to 18 years to life on one count of murder and one firearm specification.

{¶ 21} White appealed.

## II. Analysis

{¶ 22} White presents five assignments of error. The first challenges the admission of the cell-sector analysis testimony. The second challenges the admission of McGee's claim that White threatened Coatney. The third assignment of error presents sufficiency-of-the-evidence and weight-of-the-evidence challenges. The fourth challenges the flight instruction. And the fifth assignment of error claims that trial counsel rendered ineffective assistance.

### A. Cell-sector analysis testimony

{¶ 23} The first assignment of error alleges that the trial court erred by allowing Special Agent Horan to testify about the cell-sector location of White's cell phone because the testimony is unreliable.

{¶ 24} Ohio Evidence Rule 702 provides that a witness may testify as an expert if (1) the testimony "relates to matters beyond the knowledge or experience possessed by lay persons"; (2) the witness is "qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;" and (3) the testimony is "based on reliable scientific, technical, or other specialized information." Under the substantively similar Federal Rule of Evidence 702, the U.S. Supreme Court

held in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), that the trial judge has a "gatekeeping" obligation to ensure that scientific testimony is reliable. And the Court extended this holding in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), to all testimony based on "technical" and "other specialized" knowledge. The *Daubert* Court mentioned four factors that a court may consider to help determine testimony's reliability: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) in the case of a particular scientific technique, the known or potential rate of error; and (4) whether the theory or technique is generally accepted. *Daubert* at 593-594. The *Kumho Tire* Court emphasized that "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire* at 141. Rather, "in assessing reliability, the trial court may, at its discretion, consider the *Daubert* factors to the extent relevant." *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 118, citing *Kumho Tire* at 148.

{¶ 25} Here, the trial court found that Horan is "qualified as an expert" by specialized knowledge, skill, experience, training, and eduction. We agree. Horan testified that he has been an FBI special agent for about 18 years and prior to that he was an assistant county prosecutor for Montgomery County, Ohio. He is one of only ten full-time members of the FBI's Cellular Analysis and Survey Team (CAST), whose members "specialize in all things cell phones," including "historical analysis of someone's cell phone records [and] real time tracking of phones." (Tr. 672) (Sept. 25, 2014). He has had extensive specialized training in cell phone tracking. This includes training at "the

CAST School," which Horan described this way:

> [It] is a month-long school, it's over 400 hours of training and we learned additional radio frequency theory analysis, we met with all of the service providers for all the major cell phone companies, we learned how their records are kept and how to analysis them, we had expert witness training, we had training on our software platform called JDSU, which is—we use that to actually map the footprints of a cell site.
>
> We had practical exercises, moot court training and then finally a final exam that we had to pass before we were certified to go out in the field.

(*Id.* at 673). Each year, Horan attends a week-long recertification training session. In addition to his training and experience, Horan teaches in the area of cellular telephone analysis in both the United States and other countries. We also agree that Horan's testimony about how cell phones can be tracked "relates to matters beyond the knowledge or experience" of most lay people.

{¶ 26} White's primary contention is that Horan's testimony is not reliable. White contends that Horan's analysis does not consider factors that can affect what tower a cell phone connects to, such as technical characteristics of the cell tower, antennas, and phone; environmental and geographical features; and whether the phone is indoors or out. These factors can cause a cell phone to connect to tower that is farther away. Determining the behavior of radio waves requires more than just training and experience, says White, it also requires scientific calculations that account for these factors, and Horan presented no such calculations. Also, says White, Horan's theory and method of analysis have not been subject to scientific testing or formal peer review and have not

been generally accepted in the scientific community. His theory remains wholly untested by the scientific community, says White, and no evidence was offered beyond Horan's own testimony to substantiate the FBI's successful use of cell-site analysis and testing or the rate of error in the field.

{¶ 27} In support of his argument, White cites *United States v. Evans*, 892 F.Supp.2d 949 (N.D.Ill. 2012), in which the district court concluded that an FBI special agent's cell-site analysis testimony was not reliable. The court said that there are several factors that could have caused the defendant's phone to connect to these towers even though another tower was closer. The agent acknowledged these factors, said the court, but failed to account for them in his analysis, relying instead on his training and experience. But, continued the court, estimating the coverage area requires scientific calculations that account for the factors that can affect coverage, which the agent did not present. The court also said that the agent's theory was untested by science or formal peer review and had not been generally accepted by scientists. "These factors," concluded the court, "weigh against a finding of reliability." *Evans* at 957.

{¶ 28} But "other courts have reached the opposite conclusion of the *Evans* Court regarding the reliability of an agent's methodology in estimating cell sectors where the agent used cell-phone records and his general knowledge and understanding of cellular phone networks and where the agent testified that he and others had used that methodology numerous times without error." (Citations omitted.) *United States v. Davis*, S.D.Fla. No. 11-60285-CR, 2013 WL 2156659, *6 (May 17, 2013). Indeed, "the use of cell phone location records to determine the general location of a cell phone has been widely accepted by numerous federal courts." (Citation omitted.) *United States v. Jones*, 918

F.Supp.2d 1, 5 (D.D.C.2013). *See, e.g., Jackson v. Allstate Ins. Co.*, 785 F.3d 1193, 1204 (8th Cir.2015) (rejecting the contention that evidence regarding the use of historical cell phone data to identify the geographic area in which a phone was located at a given time is inherently unreliable, saying that federal courts have regularly admitted expert testimony regarding this type of evidence); *United States v. Schaffer*, 439 Fed.Appx 344, 346-347 (5th Cir.2011) (upholding the admissibility of an FBI agent's testimony pinpointing the locations where cellular telephones were allegedly used, based on "his extensive knowledge and experience in the field" and noting that the agent testified that he had used the technique without error on at least 100 occasions and that the FBI had used it successfully at least 1,000 times); *United States v. Rosario*, S.D.N.Y. No. 09-CR-415-2, 2014 WL 6076364, *2-3 (Nov. 14, 2014) (concluding that an FBI Special Agent's cell-site analysis testimony was based on techniques sufficiently reliable to be admitted under Fed.R.Evid. 702). These courts agree that the "vagaries of cell phone technology affect the persuasiveness of the circumstantial evidence, but they do not render [an expert's] testimony inadmissible." *Rosario* at *2. *Accord United States v. Fama*, E.D.N.Y. No. 12-CR186, 2012 WL 6102700, *4 (Dec. 10, 2012) (noting that the defendant "lists a variety of factors that purportedly can impact the communication of a cellular phone and a particular cellular tower * * * [but] these concerns go to the weight of [the expert's] testimony, not the reliability").

{¶ 29} Here, Horan's testimony was simply that White's cell phone was in the footprint of particular cell towers at particular times. He said that he and the FBI have successfully used the methodology he described numerous times. When Horan was asked about the factors that affect connections, Horan replied that they were irrelevant to

his analysis:

> [T]hose factors in my world are irrelevant because it doesn't matter what was going on at the time, what we know is what the phone actually did and that's the most important thing and if we know that the phone chose, let's say, sector one of tower one, two, three, we know for—with scientific certainty that that phone was in the footprint of that tower, it had to be or it wouldn't have—we wouldn't have a record.

(Tr. 702) (Sept. 25, 2014). We agree with those federal courts concluding that cell-site analysis testimony, like that given by Horan, is reliable.

**{¶ 30}** Furthermore, even if the testimony were not reliable, its admission did not prejudice White. Because there was no data presented before 10:30 p.m., Horan's testimony does not put White's phone in the area of the murder until 10:30 p.m. and thereafter. But White himself testified that he arrived home around that time. Horan's testimony does explain the locations of White's phone from 10:30 until after midnight. Also, it is not the case that Horan's testimony prejudiced White by requiring him to take the stand to offer contradiction of the cell phone evidence. White's alibi defense was that he was at the movie theater with Ivery (or driving home from the theater) when the murder occurred at around 10:25 PM. The only evidence available to support this defense was his and Ivery's testimony. It was for that reason that White chose to testify which is unrelated to Horan's testimony about where the phone was after 10:30p.m.

**{¶ 31}** The first assignment of error is overruled.

**B. White's threatening the victim**

{¶ 32} The second assignment of error alleges that the trial court abused its discretion by allowing a witness to testify that White had threatened Coatney a year-and-a-half to two years before the murder.

{¶ 33} Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." But the rule provides that the evidence may be admissible "for other purposes, such as proof of motive." Evid.R. 404(B). The defendant's other act "must have such a temporal, modal and situational relationship with the acts constituting the crime charged that evidence of the other acts discloses purposeful action in the commission of the offense in question." *State v. Snowden*, 49 Ohio App.2d 7, 10, 359 N.E.2d 87 (1st Dist. 1976), citing *State v. Burson*, 38 Ohio St.2d 157, 159, 311 N.E.2d 526 (1974). Consequently an act too distant in time has no probative value to the charged crime. *Id.* Evidence of a defendant's threats, violence, or other behavior in the months preceding a murder is probative of the defendant's motive or intent. *State v. Nields*, 93 Ohio St.3d 6, 22, 752 N.E.2d 859 (2001).

{¶ 34} Stacy McGee testified, over objection, that in either the year before the shooting or the year before that, 2010 or 2011, (T. 311-12), White called Coatney and threatened to kill him. It was later stated that the phone call was a year and a half to two years before the murder. (T. 339).   McGee said that at the time she was standing next to Coatney when he took the call on his cell phone and heard White make the threat. "They were arguing about Nielah." (T. 341). White contends that the threat has no probative value because it occurred too long ago. He also contends that McGee's testimony is

unreliable because she heard the threat while eavesdropping on the phone conversation.

{¶ 35} The state says that the evidence of the threat was not presented to prove anything about White's character or propensity. Rather, it was presented to prove his motive—that White was driven by a murderous anger against a rival he believed was disrespecting him and his relationship with Nielah Ivery. The state argues that the threat is admissible to prove that White's hostility toward Coatney was fierce, deep-seated, and long-standing. The threat tends to show that the conflict between White and Coatney was a long-standing feud over Coatney's continued relationship with Ivery. A reasonable juror could have a difficult time believing that a man could become so angry over the actions of his girlfriend's ex-boyfriend that he would kill him. The threat shows that White was that angry, that he had been angry for a long time, and that his anger was sufficient to threaten to kill. He was jealous and believed that Coatney was "effing" with him.

{¶ 36} We find the state's argument persuasive. Without doubt such a threat would be admissible if it was made closer to the killing. The only question is whether it is too remote to be probative. The decision whether to admit relevant evidence is left to the sound discretion of the trial court, and a reviewing court will not reverse that decision absent an abuse of discretion. *State v. Sage,* 31 Ohio St.3d 173, 510 N.E.2d 343, (1987), paragraph two of the syllabus. An abuse of discretion implies an arbitrary, unreasonable, or unconscionable attitude on the part of the trial court. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 37} In *State v. Cruse*, 5th Dist. Fairfield No. 2007CA0016, 2008-Ohio-4039, the court of appeals held that "threats and incidents in this case, which were limited to the six to eight month period prior to the murder, were not so removed in time as to have no

probative value and tended to show appellant acted with purpose to kill her husband." *Id.*, ¶ 55. In *State v. Allen*, 7th Dist. Belmont No. 80-B-9, 1981 WL 4822 (Jan. 27, 1981), the admission of threats to kill the decedent one and two years before the death were admissible under R.C. 2945.59, the legislative counterpart to Evid. R. 404(B). There does not appear to be any hard and fast rule in Ohio case law on the age of admissible threats made from an offender directly to a victim of violence. We note, however, that although the threat here may have been some time ago, it was made directly at the victim and was related to the ongoing and still current feud between the victim and the defendant. We are unable to conclude that the trial court abused its discretion when it admitted the threat testimony.

{¶ 38} The second assignment of error is overruled.

### C. Sufficiency and weight of the evidence

{¶ 39} The third assignment of error alleges that White's convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.

{¶ 40} White argues that the state presented no credible evidence that puts him at the murder scene. He says that Adell Lawrence's testimony contains numerous inconsistencies, that the casings found in his Tahoe are problematic, and that there is no evidence that he and Coatney had a contentious relationship at the time of the shooting.

{¶ 41} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Hunter*, 2d Dist. Montgomery No. 24844, 2013-Ohio-1469, ¶ 27, quoting *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10; *see also State v. Thompkins*, 78 Ohio St.3d 380, 386, 678

N.E.2d 541 (1997). "When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, citing *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Dennis* at 430.

{¶ 42} White was convicted of felony murder for causing Coatney's death as a result of shooting him (felonious assault), in violation of R.C. 2903.02(B), which pertinently provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing * * * an offense of violence that is a felony of the first or second degree." Adell Lawrence testified that White admitted to him that he had killed Coatney because he was tired of Coatney "effing" with him. (Tr. 717, 718, 719) (Sept. 25, 2014). Lawrence also testified that White told him that he had gotten rid of the gun on the bank of the river near White's house, which is where a gun linked to White was found. White had bought the gun a week before the murder along with ammunition that matched the casings found in his Tahoe and at the scene. While the particular gun that fired the bullets could not be identified, it was determined that the bullets were fired by a weapon with the same class characteristics as White's gun. Immediately after shots were heard, a dark SUV was seen speeding away from the murder scene, which SUV McGee identified as White's blue Tahoe. The evidence is sufficient to establish the essential elements of felony murder.

{¶ 43} In contrast to a sufficiency-of-the-evidence argument, "[a] weight of the

evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *State v. Ayers*, 194 Ohio App. 3d 812, 2011-Ohio-3500, 958 N.E.2d 222, ¶ 20 (2d Dist.). The test is familiar: "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983). *Accord Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. The credibility of the witnesses and the weight to be given to their testimony are matters for the jury to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). " 'Because the fact-finder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the fact-finder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the fact-finder, who has seen and heard the witness.' " *Ayers* at ¶ 23, quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). "This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." (Citation omitted.) *Id.* at ¶ 24.

{¶ 44} In addition to the evidence just noted, White's work supervisor testified that

White had told him that he had shot his girlfriend's ex-boyfriend in retaliation for something the man had done to him. Also, White's cell-phone records and White's own testimony put him near the murder scene at the time of the shooting. The first 911 call came in at 10:25 p.m., White admitted being in the area at around 10:30 p.m., and by 10:45 p.m., White was pulling up at Priest's house, only a short distance away.

{¶ 45} White challenges various aspects of the evidence against him. But it is the jury's role to assess the credibility of the witnesses and to decide the weight to give the evidence. We do not think that it is patently apparent that the jury lost its way in arriving at its verdict. The third assignment of error is overruled.

### D. Evidence of White's flight

{¶ 46} The fourth assignment of error alleges that the trial court erred by allowing evidence to be presented on the issue of flight. The supporting argument, however, is that the trial court abused its discretion by giving the flight instruction.

{¶ 47} White failed to object to the instruction, so all but plain error has been forfeited. *State v. Lott*, 51 Ohio St.3d 160, 167, 555 N.E.2d 293 (1990). "For plain error to exist, the defect in the trial proceedings must be obvious and must have affected the outcome of the trial." *State v. Conley*, __ N.E.3d __, 2015-Ohio-2553, ¶ 30 (2d Dist.), citing *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 16. "Notice of plain error 'is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 108, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 48} "Flight means some escape or affirmative attempt to avoid apprehension."

*State v. Wesley*, 8th Dist. Cuyahoga No. 80684, 2002-Ohio-4429, ¶ 19, citing *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1207 (10th Cir.1991). Evidence of flight is admissible as tending to show consciousness of guilt. *State v. Wood*, 2d Dist. Clark No. 2010 CA 42, 2011-Ohio-2314, ¶ 30. "Evidence of flight to support an inference of guilt should generally be limited to situations when the activities associated with flight occur at a time and place near the criminal activity for which the defendant is on trial." *Id.*, citing *State v. Frock*, 2d Dist. Clark No. 2004 CA 76, 2006-Ohio-1254, ¶ 57. But admissibility does not depend on how much time passes between the offense and the defendant's flight. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 169. The flight need not be immediate. The instruction may be appropriate when the defendant, a long-time resident of the area in which the crime occurred, was arrested months later in another state or another part of this state. *See, e.g., State v. Woods*, 1st Dist. Hamilton Nos.C-130413, C-130414, 2014-Ohio-3892, ¶ 61. *Accord State v. Jackson*, 9th Dist. Lorain No. 11CA010012, 2012-Ohio-3524, ¶ 17; *State v. Villa*, 9th Dist. Lorain No. 05008773, 2006-Ohio-4529, ¶ 31; *State v. Hudson*, 8th Dist. Cuyahoga No. 91803, 2009-Ohio-6454, ¶ 52-53; *State v. Craig*, 8th Dist. Cuyahoga No. 94455, 2011-Ohio-206, ¶ 32.

{¶ 49} The state filed an unopposed motion asking the trial court to instruct the jury on flight as consciousness of guilt. The court gave the jury this instruction:

Testimony has been admitted indicating that the Defendant fled the scene. You are instructed that flight alone does not raise a presumption of guilt but it may tend to indicate the Defendant's consciousness or awareness of guilt.

If you find that the facts do not support that the Defendant fled or if you find that some other motive prompted the Defendant's flight or if you are unable to decide what the Defendant's motivation was, then you should not consider this evidence for any purpose.

However, if you find that the facts support that the Defendant engaged in such conduct and you decide that the Defendant was motivated by a consciousness or awareness of guilt, you may but are not required to consider that evidence in deciding whether the Defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give to this evidence.

(Tr. 1231-1232) (Sept. 25, 2014).

**{¶ 50}** White contends that the evidence does not warrant a flight instruction. We disagree. An inference could be made from the evidence that White fled to Texas. When he left, he had been questioned twice about the murder, and he knew that police knew he was lying about his gun being stolen. White also knew that police had found shell casings on the driver's side floor of his vehicle. And he knew that police had recovered the gun and that they knew he bought it a week before the murder.

**{¶ 51}** Ultimately, though, the flight instruction is all but innocuous. It explains the limited use of the flight evidence and clearly says that the jury may consider White's flight only if it finds that he was "motivated by a consciousness or awareness of guilt." And even if the jury finds that this motivated him, the instruction says that it still is not required to consider the flight evidence. We do not believe that giving the jury this particular instruction could have affected the outcome of the trial.

{¶ 52} The fourth assignment of error is overruled.

## E. Claim of ineffective assistance of counsel

{¶ 53} The fifth assignment of error alleges that White's trial counsel rendered ineffective assistance.

{¶ 54} White contends that counsel's not filing a motion to dismiss based on the state's failure to preserve potentially exculpatory evidence constitutes ineffective assistance of counsel. White also contends that counsel's failure to properly cross-examine Adell Lawrence violated White's right to a fair trial. The state argues that counsel had no obligation to file a motion to dismiss and that counsel's cross-examination of Lawrence was reasonable.

{¶ 55} The standard for defense counsel's conduct was established by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.E.2d 674 (1984), and adopted by the Ohio Supreme Court in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). *Strickland* holds that when a defendant complains of the ineffective representation of counsel, the defendant must show that counsel's performance fell below an objective standard of reasonableness. *Strickland* at 687-688. Judicial scrutiny of counsel's performance must be highly deferential. *Id.* at 689. A reviewing court must indulge a strong presumption that counsel's performance falls into the wide range of reasonable professional assistance. *Id.* The defendant must also show that there is a reasonable possibility that but for the unprofessional errors of counsel the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

{¶ 56} On the Monday after the murder, a detective went to the theater White claimed to have been at Saturday night to see if there was any helpful surveillance video. The detective discovered that many of the cameras did not work, and because the cameras were intended to deter employee theft, none was positioned to clearly show patrons entering or leaving. One working camera was pointed at the box-office, but it captured only patrons entering the theater and only from the waist down. There was no video of customers leaving the theater, and there are no cameras in the parking lot. The detective reviewed the video from the box-office camera for the night of the murder but saw nothing helpful, so he did not collect it. The video was automatically erased after six months.

{¶ 57} White says that the box-officer surveillance video was exculpatory evidence that should have been preserved. White says that his alibi defense—that he was at the theater and could not have made it to the scene of the murder by the time the murder occurred—would have been substantially strengthened with video showing him at the movie theatre.

{¶ 58} "The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a criminal defendant from being convicted where the state fails to preserve materially exculpatory evidence or destroys in bad faith potentially useful evidence." (Citation omitted.) *State v. Bolden*, 2d Dist. Montgomery No. 19943, 2004-Ohio-2315, ¶ 51. There is a distinction between "materially exculpatory evidence and potentially useful evidence. If the evidence in question is not materially exculpatory, but only potentially useful, the defendant must show bad faith on the part of the state in order to demonstrate a due process violation." *State v. Geeslin*, 116 Ohio St.3d 252,

2007-Ohio-5239, 878 N.E.2d 1, ¶ 9, citing *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In order to be materially exculpatory, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

{¶ 59} Here, there is nothing that suggests that the video showed White at all. And even if it did, the most that it would have shown is the time that White arrived at the theater. As the state points out, what time he arrived is not important; it is what time he left that is critical. No surveillance video would have shown that. So while the video might have had some value to his defense, it is not "materially exculpatory." Also, there is no evidence that the state had a hand in destroying the video or acted in bad faith.

{¶ 60} White also contends that the testimony of Adell Lawrence, who testified that White confessed to him, is full of inconsistencies that could have been exposed on cross-examination.

{¶ 61} During Lawrence's interview with a detective on August 24, 2012, he said that a month after the shooting White told him what he did with the gun. But Lawrence testified that he called Crime Stoppers thirteen days after the shooting and told them that he knew where the gun was. Lawrence also told the detective that White had wiped down the gun but told Crime Stoppers that John Fisher wiped it down. Lawrence testified that he had no discontent towards White, but during his interview Lawrence conveyed the opposite. Lawrence also said that he did not know about the bad history (restraining orders, violence, and vandalism) between Ivery and Coatney. But Ivery testified that

Lawrence did know about it. Lawrence's testimony that he went to White's house the day after the shooting is contradicted by White's and Ivery's testimony that he did not. Counsel's failure to explore these areas on cross-examination, says White, constitutes ineffective assistance and denied him a fair trial.

{¶ 62} The state points out that by cross-examining Lawrence on these minor inconsistencies counsel would have given Lawrence the opportunity to clear up any confusion or correct small mistakes that he might have made in his prior responses. The state also points out that counsel knew that White and Ivery would deny that White confessed to Lawrence, so further cross-examination of Lawrence on this would not have made much difference. Counsel simply let the apparent inconsistencies in Lawrence's testimony stand uncorrected and then used them in closing arguments to show that Lawrence could not be believed when he testified that White had confessed to him and told him where he had thrown the gun. Indeed, counsel suggested to the jury that Lawrence invented the confession after White decided to break up with his stepdaughter.

{¶ 63} The extent and scope of cross-examination clearly falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel. *State v. Linville*, 10th Dist. Franklin No. 04AP-917, 2005-Ohio-3150, ¶ 31. We cannot say that counsel's cross-examination of Lawrence was objectively unreasonable.

{¶ 64} The fifth assignment of error is overruled.


### III. Conclusion

{¶ 65} We have overruled each of the five assignments of error presented for review. The trial court's judgment therefore is affirmed.

. . . . . . . . . . . . .

DONOVAN, J., concurs.

FROELICH, P.J., concurring:

{¶ 66} I concur in judgment and write briefly only to comment on the flight instruction. The homicide was on April 21, 2012, and the appellant called the police the same night and was interviewed by them for several hours, and then again on May 1.

{¶ 67} Later in May, appellant was fired from his job, but stayed in the area and found a construction job. It was only after he was hospitalized with serious work-related injuries that he moved to Texas. There is no evidence in the record that he concealed his identity or whereabouts at any time or that law enforcement had any difficulty locating him when he was arrested in late October of 2012. Appellant's alibi of being at a movie theater remained basically consistent from his first contact with the police through his testimony at trial.

{¶ 68} I would find that the evidence did not warrant a flight instruction. However, given the lack of objection, the totality of the evidence, and the wording of 2 OJI-CR 409.13 given by the court, any error was harmless beyond a reasonable doubt.

. . . . . . . . . .

Copies mailed to:

Mathias H. Heck
Carley J. Ingram
Lucas W. Wilder
Hon. Dennis J. Adkins